# 2007 DTA 123

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE MAYAGÜEZ / AGUADILLA
PANEL IX**

DEPARTAMENTO DE LA FAMILIA
Recurrente

v.

ROWYNA COLÓN VILLANUEVA
Recurrida

Núm. KLCE-2007-00860

San Juan, Puerto Rico, a 26 de octubre de 2007

Panel integrado por su Presidente, el Juez Rodríguez Muñiz,
y los Jueces Soler Aquino y Cordero Vázquez

Cordero Vázquez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

En esta ocasión nos corresponde resolver un recurso de *Certiorari* presentado por el Procurador General de Puerto Rico (PG), en representación de los intereses defendidos por la Procuradora de Asuntos de Familia (PAF), quien solicita la revisión de una Resolución y Orden dictada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI-Mayagüez), el 30 de enero de 2007 y notificada el 1 de febrero de 2007, que accede a lo solicitado por el Departamento de la Familia de Puerto Rico (DF). El PG (que representa al Estado) presenta un *Certiorari* para impugnar una resolución judicial que concede lo solicitado por otra agencia del Estado. El resultado de esto es que el PG está solicitando un recurso contra otra agencia del Estado, aunque lo que se haya solicitado se refiera a la actuación judicial del TPI-Mayagüez y que sea en los *"mejores intereses"* de una menor. Por considerar que resulta indispensable nuestra intervención en este caso, no abordamos la cuestión que nos presenta la contradictoria posición del Estado en este momento.

En la Resolución y Orden recurrida, el TPI-Mayagüez dejó sin efecto una Orden del 8 de septiembre de 2006 que requería al DF evaluar, con un estudio social, a **Yadira Villanueva González** (Yadira) como recurso familiar para una sobrina menor de edad (KMCC) removida del hogar de una hermana de Yadira, **Yolanda Villanueva González** (Yolanda), quien tenía la custodia física de KMCC desde que nació la menor. Yadira llevaba cierto tiempo ofreciéndose al DF como recurso familiar para la custodia o adopción de su sobrina-nieta KMCC. Con

este propósito, Yadira ha comparecido personalmente con escritos y mociones, así como por conducto de la PAF ante el TPI-Mayagüez.

Luego de repetidas órdenes judiciales para exigir que el DF cumpliera con el requerimiento de producir el estudio social de Yadira como recurso familiar (las cuales no fueron oportunamente acatadas), el DF indujo al TPI-Mayagüez —mediante una *Moción Aclaratoria (Solicitud se deje sin efecto Orden)*— que reconsiderara su posición original y dejara sin efecto la Orden judicial del 8 de septiembre de 2006 que ordenaba al DF el estudio social de Yadira como recurso familiar para KMCC. Finalmente, en la Resolución y Orden recurrida, el TPI-Mayagüez **descartó** a Yadira como recurso familiar u hogar sustituto para KMCC.

El fundamento utilizado por el DF en su moción "*aclaratoria*" es que Yadira no había cumplido con el trámite administrativo para los casos de adopción. El DF también alegó que el TPI-Mayagüez en forma errada había ordenado el 8 de septiembre de 2006 a la Unidad de Cuidado Sustituto el referido estudio social de Yadira como recurso familiar de KMCC, cuando el plan de permanencia recomendado por el DF para ella era de adopción y la unidad "*pertinente*" en esos casos era la Unidad de Adopción del DF y no la de Cuidado Sustituto. El DF añadió que KMCC ya estaba colocada en un hogar preadoptivo con personas certificadas y cualificadas por el DF como padres preadoptivos en turno. En su petición, añadió que Yadira no estaba certificada por el DF como recurso preadoptivo. Igualmente, el DF señaló en su pedido que Yadira ni siquiera se relacionaba con KMCC.

El PG nos intima que el efecto práctico de la Resolución y Orden recurrida es dejar a KMCC en el hogar preadoptivo en el cual fue colocada cuando el DF la removió de su hogar de crianza con Yolanda. Ese hogar preadoptivo actual está compuesto por personas que **no son** familiares consanguíneos de KMCC.

No obstante, no se desprende de la moción ni de los escritos del DF que las personas que solicitan o han solicitado constantemente la "*custodia*" temporera o permanente de KMCC —en lo que se dilucidan unos procedimientos *pendente lite* de adopción para KMCC—, **son familiares consanguíneos** de KMCC, con quienes la menor convivió junto a su otra hermanita consanguínea antes de su remoción del hogar de Yolanda. Tampoco explica por qué razón el DF **cambió** el plan de permanencia original que ya tenía para KMCC. Claramente, ese plan de permanencia disponía **adopción por parientes o el concurrente: colocación con parientes**. En el récord del caso no se incluye nada acerca de un informe de razones para alterar o cambiar ese plan de permanencia original o las razones para descartar todos los recursos familiares de KMCC que habían manifestado su disponibilidad. ■

Ni el DF ni la Resolución y Orden recurrida aclaran que la razón para que Yadira no se haya relacionado por los pasados meses con KMCC es precisamente por la prohibición establecida por el DF. En procesos de preadopción, el DF exige terminar todo vínculo con la familia original consanguínea, por lo que no permite a los familiares de KMCC relacionarse con ella. No obstante, a pesar de toda esta alegada "*regulación*", el DF permite a KMCC relacionarse con sus hermanitos consanguíneos en reuniones supervisadas.

El 20 de febrero de 2007, el TPI celebró la "*vista de seguimiento*" para discutir la moción del DF que culminó en la Resolución y Orden cuya revisión se solicita. A esta vista no compareció Yadira y, además, **no aparece del récord que fuera citada** para concederle el privilegio de ser oída, más aún cuando lo que se discutiría sería el "*nuevo*" plan de permanencia en el que se le descartaba como recurso familiar para KMCC. Tampoco se citó a Yolanda, quien era el recurso familiar con la custodia física de KMCC desde que ésta nació y le fuera entregada por el propio DF y quien además había sido previamente certificada como el recurso adoptivo de KMCC. Al menos, si el "*nuevo*" plan de permanencia del DF descartaba reunificar a KMCC con sus padres de crianza ("preadoptivos") y encargados de KMCC (a su vez, familiares consanguíneos más cercanos), el DF tenía que expresar las razones para apartarse de las propias regulaciones administrativas que postulan lo contrario. Evidentemente, el DF utilizó el trabajo del primer caso de remoción de KMCC (del hogar de sus padres biológicos) y lo readaptó a una nueva determinación administrativa. Para validar eso se requería la comparecencia

de Yolanda a la vista de seguimiento y la oportunidad de ser oída. Sin embargo, el TPI-Mayagüez y las abogadas en la vista se opusieron a la intervención de Yolanda.

De hecho, el TPI-Mayagüez no permitió la intervención de ningún familiar de KMCC en la vista en la que se dictó la Resolución y Orden recurrida. A pesar de que el TPI-Mayagüez advino en conocimiento que el DF había "*cambiado*" unilateralmente el plan de permanencia de KMCC, no permitió a sus padres de crianza y encargados (parientes consanguíneos de KMCC) ser escuchados en una audiencia. El TPI-Mayagüez —que únicamente contaba con **testimonio** ex parte de los funcionarios del DF y los argumentos de su representación legal—, dispuso del caso al resolver que **no había asunto alguno que el TPI-Mayagüez judicialmente pudiera resolver**. Además, el TPI-Mayagüez **descartó** a Yadira como recurso familiar para la menor desplazada de su núcleo familiar bajo la "*custodia*" del DF, por los fundamentos esgrimidos por el DF, **sin que ello resolviera la seria controversia que nos presenta este caso**.

Finalmente, el TPI-Mayagüez refirió a Yadira, **sin escucharle**, al DF para que esa agencia le proveyera el recurso adecuado, si alguno. Eso significaría que el DF podía continuar los procesos que mantienen separada a KMCC de sus familiares y hermanitos consanguíneos a pesar de los reclamos de éstos. Más aún, en ausencia de Yadira y de la PAF, formulando unas determinaciones de hechos relacionados con la conducta de Yadira y sus familiares (basados únicamente en el testimonio ex parte del DF), el TPI-Mayagüez *motu proprio* emitió una Segunda Minuta Enmendada en apoyo a la Resolución y Orden recurrida.

El PG alega que el TPI-Mayagüez erró:

*"...al dejar sin efecto las Resoluciones previamente emitidas, donde se le requería al Departamento de la Familia que hiciera un estudio social, a los fines de determinar si la Sra. Yadira Villanueva es un recurso adecuado para tener la custodia física (de) KMCC, aun cuando ésta solicitó ser considerada como recurso al momento en que la menor fue removida del hogar que estaba en vías de adoptarla."*

Evaluado el extenso expediente de este caso, así como los Alegatos de las partes, este Tribunal considera que el TPI-Mayagüez se excedió en el ejercicio de su discreción al no conceder el debido proceso de ley a las partes indispensables que directamente quedan afectadas con el dictamen emitido en esa vista de seguimiento del plan de permanencia de KMCC. Igualmente, el TPI-Mayagüez se excedió en su discreción al dejar sin efecto la Orden que requería al DF cumplir con su deber ministerial de completar un estudio social de Yadira como recurso familiar de KMCC.

Por los fundamentos y las razones que exponemos a continuación, este Tribunal **revoca** la Resolución y Orden recurrida.

I

## A. Historial de la menor KMCC

El 4 de octubre de 1999, el DF presentó ante el Tribunal de Primera Instancia, Sala Municipal de Lajas (TPI-Lajas) (Municipal); una petición de emergencia al amparo de la Ley Núm. 75 del 28 de mayo de 1980, conocida como la Ley de Protección a Menores, 8 L.P.R.A. secs. 2001-2014. El DF solicitaba la adjudicación de custodia de la menor OACC debido a que ésta fue abandonada en el hospital por su madre **Rowyna Colón Villanueva** (Rowyna), sobrina materna de las mencionadas Yolanda y Yadira. Rowyna es la recurrida identificada en el epígrafe del presente caso.

El caso en el TPI-Lajas (Municipal) fue identificado como IMM 1999-0135. El DF visitó el hogar de Rowyna y lo encontró en condiciones insalubres. Por estas razones, en la vista judicial celebrada por el TPI-Lajas (Municipal) se dictó Resolución y Orden en la que se otorgó la **custodia provisional** de OACC al DF. El 6 de

diciembre de 1999, OACC fue dada de alta del hospital y ubicada por el DF en el hogar de su tía abuela materna Yolanda. Luego de varios trámites procesales, el TPI-Mayagüez dictó Sentencia en la que acogió una estipulación de las partes y concedió la **custodia permanente** de OACC a Yolanda y a su esposo Pablo Acevedo (Acevedo).

Posteriormente, Rowyna dio a luz a otra hija, KMCC, quien es **objeto de la presente controversia**. Al otro día del alumbramiento de KMCC, el DF presentó ante el TPI-Lajas (Municipal) una petición de urgencia al amparo de la Ley Núm. 342 del 16 de diciembre de 1999, conocida como la Ley para el Amparo a Menores en el Siglo XXI, luego derogada por la Ley Núm. 177 del 1 de agosto de 2003, Ley para el Bienestar y Protección Integral de la Niñez, 8 L.P.R.A. sec. 444 *et seq*. En la petición, el DF solicitó la custodia de KMCC por estar en riesgo su seguridad y bienestar. El TPI-Lajas (Municipal) emitió una Resolución y Orden en la que entregó la **custodia provisional** de KMCC al DF. El DF **también colocó a la menor KMCC en el hogar de Yolanda** desde que fuera entregada por el hospital.

En la vista de ratificación de custodia celebrada el 22 de mayo de 2001, el TPI-Mayagüez dictó Sentencia en la cual concluyó que la remoción de KMCC fue conforme a derecho y entregó la **custodia legal permanente** al DF. Erróneamente, el TPI-Mayagüez decretó el cierre y archivo del caso y notificó su determinación el 2 de julio de 2001.

Luego de esto, el TPI-Mayagüez —mediante Orden del 13 de marzo de 2003—, reconoció que bajo los preceptos federales la entrega de la custodia permanente de las menores al DF no constituye la disposición final del caso, sino que se requiere un plan de permanencia para ellas. En consecuencia, el TPI-Mayagüez ordenó al DF que en un plazo de 15 días informara el status de las menores. El 7 de mayo de 2003, el DF presentó una *Moción en Cumplimiento de Orden* con la cual acompañó el plan de permanencia para KMCC. El plan de permanencia recomendado para KMCC era *"adopción por familiares"* y el plan concurrente era *"colocación permanente con familiares"*. En el informe **se identificó a Yolanda como el recurso familiar**, ya que tenía la custodia física de KMCC desde que nació, así como la custodia permanente de la otra hermanita, OACC. **Ambas hermanitas, OACC y KMCC, se estaban criando juntas** en el hogar de Yolanda.

El TPI-Mayagüez señaló vista de seguimiento para el 9 de septiembre de 2003, en la que el DF ratificó su recomendación conforme al mencionado plan de permanencia. Para culminar los procesos de adopción se requería la privación de la patria potestad de KMCC, por lo que el DF presentó la correspondiente demanda de privación de patria potestad contra Rowyna y el padre biológico de las menores, Henry Cruz Rivera. En la vista, a la que compareció Rowyna, el DF ratificó que el plan de permanencia seguía siendo *"adopción por parientes"* y el concurrente de *"colocación permanente con familiares"*.

El TPI-Mayagüez señaló vista para el 24 de febrero de 2004 y nuevamente ratificó el referido plan de permanencia original. A esa vista también compareció Rowyna. El TPI-Mayagüez señaló vista de privación de patria potestad para el 25 de mayo de 2004.

Así las cosas, Rowyna dio a luz un varón (MJCV) el 25 de mayo de 2004. Al nuevamente subsistir las razones para la intervención del DF a favor de los menores, el DF presentó una petición de emergencia ante el Tribunal de Primera Instancia, Sala Municipal de Hormigueros (TPI-Hormigueros) (Municipal) el 28 de mayo de 2004, en la que solicitó la custodia provisional de MJCV. Este caso fue identificado como ISRF 2004-00771. Ese tribunal dictó una Resolución y Orden, en la cual entregó la **custodia provisional** de MJCV al DF.

La vista del 25 de mayo de 2004 fue transferida para el 14 de septiembre de 2004 y ese día, al informarle al TPI-Mayagüez los incidentes del caso de ratificación de privación de custodia de MJCV en otra sala, se determinó consolidar el caso de privación de patria potestad de KMCC con el caso de ratificación y entrega de custodia permanente de MJCV.·

## B. Incidencias del juicio de adopción

El 9 de julio de 2004, Yolanda y Acevedo, quienes tienen lazos de consanguinidad y afinidad, respectivamente, con KMCC y OACC presentaron una petición de adopción para ambas menores ante el Tribunal de Primera Instancia, Sala Superior de Aguadilla (TPI-Aguadilla). Ese caso tiene el número AEX-2004-008. Yolanda y Acevedo tenían la **custodia permanente** de OACC desde los 3 meses de nacida y la **custodia física** como **encargados** de KMCC desde que le fuera entregada por el DF en el hospital, luego de ésta nacer. Del récord no se desprende que el DF se opusiera a la petición de adopción. De hecho, los informes y estudios del DF en ese tiempo los recomendaban como los recursos adoptivos para las menores. El expediente parece indicar que la petición se presentó ante el TPI-Aguadilla con la anuencia inicial del DF.

El 11 de octubre de 2004, el TPI-Aguadilla ordenó al DF culminar el procedimiento de privación de patria potestad en el TPI-Mayagüez. Antes de concluir los procedimientos, el TPI-Aguadilla concluyó que de los documentos en el caso de adopción no surgía la privación de patria potestad a los padres biológicos de las menores. Por esa razón, el TPI-Aguadilla **ordenó el archivo administrativo del caso**, mediante una Resolución (notificada como Sentencia) del 4 de abril de 2005.

Mientras, el 8 de febrero de 2005, el TPI-Mayagüez **ya había celebrado la vista de privación de patria potestad**. No obstante, a la fecha del archivo administrativo por *"Sentencia"* del TPI-Aguadilla, todavía el TPI-Mayagüez no había notificado su Sentencia sobre privación de patria potestad. Con fecha del 11 de mayo de 2005, el TPI-Mayagüez dictó esa Sentencia (notificada el 24 de mayo de 2005) en la que privó a los padres biológicos de KMCC de la patria potestad sobre ella, más la custodia y la patria potestad en cuanto a MJCV. En relación con ambos menores, el TPI-Mayagüez entregó la **custodia *"permanente"*** al DF.

Estando así los eventos procesales (judiciales) en ambos tribunales de primera instancia, el 10 de mayo de 2005, el DF alegadamente recibió una llamada anónima en la que se informó que en el hogar de Yolanda se maltrataba a **las menores**. Con esa información anónima, el DF removió **sólo** a KMCC del referido hogar.

Esta *"segunda"* remoción de KMCC, en esta ocasión de su hogar de crianza preadoptivo con familiares consanguíneos, es la que da inicio a la odisea procesal que mantiene a varias familias en un estado emocional cargado de ansiedad y que *"culmina"* con un recurso de *Certiorari* ante este Tribunal.

El DF, en abierta contradicción con sus propios procedimientos, en primer lugar, sólo removió a una de las menores (KMCC) que viven en el hogar de Yolanda. En segundo lugar, en abierta contradicción con el plan de permanencia vigente al momento de la remoción y varias veces ratificado por el foro de instancia, el DF colocó a KMCC en un hogar de extraños en lugar de colocarla en otro hogar con parientes de los que conocía que estaban disponibles para recibirla.

Claramente, y en clara contradicción con los procesos judiciales, **antes de que la Sentencia del TPI-Aguadilla en el caso de adopción fuera final y firme** (de hecho, ésta fue revocada por el Tribunal de Apelaciones, lo que mantiene las posibilidades de que finalmente Yolanda pueda adoptar a KMCC), colocó a KMCC en un hogar preadoptivo diferente y ordenó a terminar todo vínculo con los parientes consanguíneos de KMCC. █

Una vez el DF removió en el 2005 a KMCC del hogar de crianza preadoptivo de la menor, **no hizo intento alguno de reunificar** a la menor con sus padres de crianza, quienes son los parientes consanguíneos que la han criado desde su nacimiento. Por otro lado, en el expediente del caso no hay evidencia de maltrato contra KMCC; el DF nunca ha presentado evidencia al respecto.

El récord de este caso tiende a evidenciar que la investigación administrativa no produjo corroboración

confiable de la llamada anónima que provocó la "*segunda*" remoción de KMCC. No obstante, el DF no hizo intentos de reunificar la familia ni aplicar los remedios que viene obligada en ley a proveer en alegados casos de maltrato. Sencillamente, el DF colocó a KMCC en otro hogar preadoptivo con extraños a su entorno familiar y unilateralmente, sin revisión judicial alguna, **cambió** el plan de permanencia original de KMCC. El DF únicamente utilizó la parte del plan de permanencia original que disponía para "*adopción*" y con ello pretende justificar la colocación de KMCC en un hogar diferente, aunque sean personas acreditadas por el DF en turno para adopción.

El récord tampoco presenta evidencia de que hubo intervención judicial en este segundo evento de remoción, ello sin perder de vista —con mucha aprehensión— que luego de la alegada llamada anónima en la que se planteó el alegado maltrato, el DF sólo removió a **una** de las menores que estaba pendiente de adopción y dejó a los otros menores en el hogar de Yolanda y Acevedo.

Por su parte y a raíz del archivo decretado por el TPI-Aguadilla, el 17 de mayo de 2005, Yolanda y Acevedo presentaron una *Moción solicitando relevo de sentencia y continuación de los procedimientos y vista urgente* para que el tribunal dejara sin efecto su Sentencia de archivo en el caso de adopción solicitado por ellos, ya que el TPI-Mayagüez había culminado la vista de privación de patria potestad aludida en su Sentencia de archivo. Igualmente, recurrieron al foro de instancia para impugnar los fundamentos y la alegada arbitrariedad en la remoción de KMCC. El TPI-Aguadilla señaló vista para evaluar lo solicitado y así determinar la idoneidad de Yolanda y Acevedo como padres adoptivos de KMCC y OACC. Tal y como dispone la ley, el TPI-Aguadilla no consolidó otro procedimiento judicial con el de adopción.

Previa desestimación de las pretensiones del DF acerca de no desfilar prueba en el caso, por alegar que la reubicación de KMCC respondía a una actuación administrativa fuera de la tutela jurisdiccional del tribunal (argumentos que fueron desestimados por el TPI-Aguadilla y ratificados por este Tribunal en un recurso de *Certiorari*), el TPI-Aguadilla celebró la vista evidenciaria el 17 y 24 de junio de 2005. Luego del desfile de prueba, el TPI-Aguadilla dictó Sentencia el 19 de octubre de 2005 (notificada el 24 de octubre de 2005), en la que decretó ***No Ha Lugar*** la solicitud de adopción presentada por Yolanda y Acevedo.

A pesar de no haber consolidado el procedimiento de la "*segunda*" remoción con el caso de adopción, en su Sentencia, el TPI-Aguadilla acogió los planteamientos del DF (de remover a KMCC del hogar de Yolanda y Acevedo) como fundamentales para no considerar el hogar de éstos idóneo para la adopción de las menores. **El TPI-Aguadilla claramente indicó en su Sentencia que la Unidad de Maltrato del DF no había rendido un informe sobre la investigación de los hechos alegados contra Yolanda y que otras alegaciones no estaban fundamentadas.** Sin embargo, **a base de sus propias conclusiones,** el TPI-Aguadilla decretó que Yolanda no contaba con las "*características ni herramientas ideales*" para considerarla como madre adoptiva de KMCC y OACC. Luego de presentada una oportuna solicitud de reconsideración, el TPI-Aguadilla la declaró *No Ha Lugar* el 9 de noviembre de 2005. Yolanda y Acevedo apelaron la Sentencia ante este Tribunal.

El 30 de marzo de 2006, el Tribunal de Apelaciones (TA) **revocó** la Sentencia apelada en el caso de adopción dictada por el TPI-Aguadilla. Finalmente, el TA dispuso —luego de una muy ponderada y extensa evaluación del caso KLAN-05-01428— que el TPI-Aguadilla "*debió esperar que finalizara la investigación que llevaba a cabo la unidad de maltrato; solicitar evaluación psicológica de los padres (adoptantes) a los fines de que profesionales de este campo ilustraran al tribunal sobre la conducta y capacidad de éstos*". El TA también concluyó que aunque la Unidad de Maltrato había recibido una llamada anónima acerca de que las menores eran maltratadas en el hogar de Yolanda, "*[l]a investigación que realizaron los funcionarios de dicha unidad determinó que no había base suficiente para sostener un alegado maltrato, por lo que se recomendó el archivo del caso*". (Subrayado nuestro.) Esta Sentencia fue archivada en autos el 31 de marzo de 2006. En la mencionada Sentencia emitida por este Tribunal en el caso KLAN-05-01428 se expresa que:

*"... el foro de instancia estaba obligado a evaluar concienzudamente la conducta de los apelantes, para poder determinar si éstos eran idóneos para adoptar a las menores objeto de esta controversia.*

*En el presente caso, la parte apelante admitió, que le dio dos cachetadas a su hija biológica en la escuela por ésta no haber salido bien en las notas. Si bien ésta no es una conducta apropiada, debemos reconocer que las menores OACC y KMCC, quienes tienen vínculos consanguíneos con la señora Villanueva [Yolanda], por ser éstas hijas de su sobrina, han estado **desde su nacimiento** con los apelantes y no se ha presentado prueba tendente a demostrar la existencia de un patrón de maltrato en su contra, al punto de que la **Unidad de Adopción recomendó favorablemente la petición**. Más aún, las trabajadoras sociales que intervinieron con los apelantes en torno al alegado maltrato no recomendaban que se diligenciara una petición de emergencia al amparo de la Ley 177, supra, ya que en la situación de autos "no procedía remover" a las menores, sino darle seguimiento y ofrecerle orientación para que la señora Villanueva pudiera manejar su conducta".*

*[...]*

***En el presente caso, el Departamento de la Familia no cumplió con dicha obligación, por lo que el Procurador de Relaciones de Familia procedió a presentar la prueba.***

*Consideradas las particulares circunstancias de este caso, entendemos que la prueba presentada fue insuficiente e incompleta para apoyar el dictamen emitido. En aras de propiciar el mejor bienestar de estas menores, el foro de instancia debió considerar otras alternativas para determinar la idoneidad de los apelantes antes de emitir su dictamen."* (Énfasis suplido.) (Subrayado nuestro.)

## C. Hechos procesales que desencadenan el presente recurso

En forma paralela con los procedimientos de adopción en el TPI-Aguadilla, el 18 de mayo de 2005, Yolanda y Acevedo solicitaron al TPI-Mayagüez intervenir en las vistas de seguimiento del caso de maltrato y remoción de KMCC (correspondiente al caso de epígrafe que nos ocupa). Por su parte, la PAF se opuso el 10 de junio de 2005 a la solicitud de intervención, ya que la situación planteada por Yolanda y Acevedo se relacionaba con la *"segunda"* remoción de KMCC, la cual era investigada en ese momento por la Unidad de Maltrato Institucional del DF. La PAF solicitó una vista urgente sobre el plan de permanencia a seguirse en el caso de KMCC. Nuevamente, el 28 de diciembre de 2006, la PAF solicitó una vista urgente de seguimiento al plan de permanencia en el caso. La PAF añadió en su escrito que **Rebecca Villanueva González** (Rebecca), otra tía-abuela de KMCC, OACC y MJCV, así como hermana de Yolanda, Yadira y **Orquídea Villanueva González** (Orquídea), le hizo llegar unas copias de mociones y escritos en los cuales expresaba que tanto ella como su hermana Yadira tenían interés en ser evaluadas como recursos familiares para la menor KMCC, pendiente la resolución final del caso de Yolanda respecto a la adopción en el TPI-Aguadilla. La PAF solicitó al TPI-Mayagüez una vista de seguimiento para discutir el plan de permanencia de las menores y para que se realizara el correspondiente estudio social de esos *"recursos"* a los fines de determinar si podían tener la custodia física de KMCC.

Finalmente, el 10 de febrero de 2006, el DF discutió un informe social del caso. En tal informe se indicó que la menor KMCC fue colocada en un hogar preadoptivo como consecuencia de un incidente entre Yolanda y una de sus hijas biológicas, **evento que ya el TA había evaluado y adjudicado [3]** en su Sentencia del 30 de marzo de 2006, específicamente a las páginas 26 y 27.

Aquí es que, sin justificación coherente, el DF insistió en que el plan de permanencia de KMCC era la adopción, por lo que esta menor fue colocada en un hogar de padres preadoptivos certificados por el DF, lo que resultaba en un cambio al resultado del primer informe para el plan de permanencia de KMCC, el cual recomendaba la **adopción por parientes** o el plan concurrente de **custodia permanente con parientes**. Sin

embargo, en su **"nuevo"** informe, el DF indicó que el plan de permanencia recomendado para KMCC era la adopción por los *"padres de crianza"* (no parientes) y que estaba colaborando con esos padres de crianza con quienes había colocado a KMCC para adopción.

A pesar de que Yolanda y Acevedo reiteraron —mediante moción— su deseo de intervenir en el caso, el TPI-Mayagüez declaró *No Ha Lugar* tal solicitud el 2 de marzo de 2006. El TPI-Mayagüez expresó que *"[l]a situación planteada se encuentra en trámites administrativos ante la agencia, Departamento de la Familia, a quien le compete resolver definitivamente dicho asunto."*

### D. Hechos procesales finales

Con esta determinación del 2 de marzo de 2006, el TPI-Mayagüez liberó al DF de tener que rendir cuentas a Yolanda y Acevedo en cuanto a las actuaciones del DF respecto a KMCC. Al remover a KMCC y ubicarla en un hogar de crianza preadoptivo con personas no parientes, el DF desatendió los informes anteriores, así como el plan de permanencia vigente, que claramente disponían que la adopción o custodia recomendada para KMCC era **con parientes**.

La remoción *"permanente"* efectuada por el DF se realizó sin intervención judicial, sin ningún intento del DF de *"orientar"* a Yolanda en cuanto a su conducta (si en efecto hay algo de veracidad en las *"aprehensiones"* del DF), sin ningún intento de reunificar a la familia con KMCC y sin ningún reparo al no utilizar los recursos de parientes disponibles para recibir la custodia temporera de la menor.

En la vista de seguimiento señalada por el TPI-Mayagüez para el 27 de junio de 2006 en torno al **"nuevo"** o **"modificado"** plan de permanencia del DF para los menores KMCC y MJCV, el trabajador social a cargo del caso, Jaime A. Reteguis Ortiz (TS Reteguis), informó que los menores **ya habían sido ubicados en hogares de crianza preadoptivos**, ello sin que Yadira pudiera refutar los planteamientos expuestos en la vista, pues **nunca fue citada. Además, a otros parientes de KMCC tampoco se les permitió intervenir o no fueron citados.** ■

La recomendación del TS Reteguis o del DF para continuar con el *"nuevo"* plan de permanencia **era contraria** a la señalada en el plan de permanencia original, cuya vigencia nunca ha sido cuestionada en el récord ante este Tribunal. El DF nunca cuestionó sus propios informes y, además, el TPI no cuestionó la razón del cambio realizado por el DF **después** de que KMCC fuera colocada por funcionarios del DF en un hogar de crianza preadoptivo con personas extrañas al núcleo familiar de KMCC.

Para justificar su actuación, el personal del DF concluyó que Rebecca y Yadira no fueron consideradas como recursos porque éstas alegadamente no eran protectoras. En el expediente no hay evidencia que demuestre que el TPI-Mayagüez cuestionara el significado de esa críptica inferencia. Además, del récord surge que lo que *"preocupaba"* al personal del DF era que *"les daba la impresión"* de que Yadira y Rebecca querían la custodia de KMCC para entregarla de vuelta a Yolanda.

Los funcionarios del DF indicaron que alegadamente Yadira no había hecho gestiones en el DF para ser considerada como recurso familiar. Evidentemente, el TPI-Mayagüez dio mucha importancia a ese aspecto a pesar de que **existía** una Orden de que se preparara un estudio sobre la disposición y aptitud de Yadira como recurso familiar para la custodia de KMCC. Mediante la Resolución y Orden recurrida, el TPI-Mayagüez dejó sin efecto esa Orden.

Por un lado, el DF solicitó al TPI-Mayagüez que no considerara a Yadira como recurso familiar para KMCC porque ello no corresponde al **"nuevo"** plan de permanencia que promueve la adopción para KMCC por personas no parientes (y el DF consiguió que el TPI-Mayagüez se lo concediera) y, por otro lado, el DF alegó que la razón para descartar a Yadira es que ella no ha realizado las gestiones administrativas para ser considerada como

recurso familiar.

La evidencia presentada por Yadira en este caso corrobora lo erróneo de toda esta apreciación del DF y lo que le representó al TPI-Mayagüez. Como no se permitió la intervención ni la presencia de las hermanas Villanueva-González en la vista de seguimiento del plan de permanencia de KMCC, el TPI-Mayagüez no estuvo en posición de aquilatar de manera adecuada toda la prueba del caso.

De los documentos sometidos a la PAF surge que Yadira había solicitado ser considerada como recurso desde el 3 de mayo de 2005. Yadira presentó una moción por propio derecho el 2 de agosto de 2006, en la que indicó al TPI-Mayagüez las numerosas gestiones que hizo en el DF para ser considerada como recurso familiar de su sobrina-nieta KMCC.

El 10 de agosto de 2006, la PAF solicitó al TPI-Mayagüez que ordenara al DF evaluar a Yadira como recurso familiar para KMCC. El 8 de septiembre de 2006, el TPI-Mayagüez dictó la Orden para que el DF evaluara a Yadira como recurso familiar, orden que fue dejada sin efecto, a instancias del DF, mediante la Resolución y Orden recurrida. Yadira reiteró su solicitud a través de otras mociones por derecho propio. En éstas, Yadira reiteró su disponibilidad para aceptar la custodia de KMCC en su casa o adoptarla si la petición de adopción de su hermana Yolanda no prosperaba.

Finalmente, el DF —sin rendir el informe solicitado— mediante su *Moción Aclaratoria* logró que el TPI-Mayagüez acogiera sus planteamientos. En primer lugar, el DF argumentó —en forma adelantada y sin evidencia documental— que **aun cuando no constaba por escrito,** a Yadira la iban a rechazar como recurso u hogar sustituto, ya que ésta no tenía licencia del DF.

El TS Reteguis en su *"informe"* sobre el *"nuevo"* plan de permanencia de KMCC, en lugar de presentar resultados sobre la capacidad y conveniencia de Yadira como recurso familiar según se ordenó, solicitó que se permitiera a la Unidad de Adopción continuar la adopción de KMCC con los *"padres preadoptivos"* porque esos eran los planes de la agencia. El DF, por conducto de su representante legal, alegó al TPI-Mayagüez que Yadira no podía ser considerada como recurso familiar porque ella se ofrecía como hogar de cuidado sustituto y el plan de permanencia de KMCC era para adopción por personas no parientes que actualmente tienen su custodia.

El DF alegó que el ofrecimiento de Yadira no podía ser considerado por el TPI-Mayagüez, ya que Yadira no había cumplido con el trámite administrativo, por lo que fue descartada como recurso familiar. Por su parte, la PAF alegó que ni a Yadira ni a la familia de KMCC se le había dado la oportunidad de relacionarse con la menor ni de ser considerada como recurso familiar para lograr la custodia de su pariente tal y como recomendaba el plan de permanencia original para KMCC, según ratificado en múltiples ocasiones. Pese a la audiencia celebrada (a la que no fueron citadas las partes indispensables afectadas con la decisión judicial), el TPI-Mayagüez reiteró su posición de descartar a Yadira como recurso familiar y la refirió al trámite administrativo, irrespectivo de las negativas del DF de concederle acceso u oportunidad para ser considerada como recurso familiar para KMCC. El TPI-Mayagüez se hizo eco de los planteamientos del DF y reafirmó que el fundamento para su decisión fue que Yadira no había completado el procedimiento administrativo.

## E. Resumen de los hechos materiales del caso

1. Rowyna fue privada de la custodia y patria potestad de sus hijos menores de edad OACC, KMCC y MJCC desde que éstos nacieron, por estar en riesgo su seguridad y bienestar físico. El caso ante nuestra consideración se relaciona con las vistas de seguimiento del plan de permanencia en el caso de maltrato asociados a la menor KMCC.

2. OMCC y KMCC fueron entregadas a Yolanda y Acevedo desde que salieron del hospital luego de nacer.

Yolanda tiene lazos consanguíneos con ambas menores y es la tía-abuela materna de las menores, además de ser *"madre de crianza"* con la custodia permanente de OMCC y la custodia física de KMCC. Ambas menores se criaron juntas en ese hogar y núcleo familiar hasta el momento en que el DF removió a KMCC. OMCC todavía está en el hogar de Yolanda.

3. El 9 de julio de 2004, Yolanda y Acevedo presentaron una petición de adopción ante el TPI-Aguadilla para ambas menores. Para esa fecha, el matrimonio contaba con una recomendación favorable de la Unidad de Adopción del DF para adoptar a las menores. Del récord de este caso no surge evidencia acerca de que tal recomendación fuera revocada. El plan de permanencia original del DF identificaba y recomendaba a Yolanda y Acevedo como recursos adoptivos.

El plan de permanencia original del DF para la menor KMCC (el cual fue informado al TPI-Mayagüez en la vista del 9 de septiembre de 2003), era **adopción por familiares** y el plan concurrente era **colocación permanente con familiares**. Este plan de permanencia está conforme a la reglamentación del DF.

4. La petición de adopción presentada por Yolanda y Acevedo no pudo tramitarse con prontitud porque los padres biológicos de las menores no habían sido privados de la patria potestad, aspecto fundamental para la adopción en estos casos. La petición se presentó con la anuencia del DF. El TPI-Aguadilla declaró *No Ha Lugar* a la petición de adopción. Luego de esto, el TA revocó al TPI-Aguadilla y ordenó la continuación de procedimientos, lo que aún está pendiente al momento de resolver este *Certiorari*.

5. Mientras se realizaban los trámites de adopción, el 10 de mayo de 2005, personal del DF removió a la menor KMCC del hogar de Yolanda y Acevedo. En ese hogar se quedó la hermana de KMCC, OACC, y los dos hijos biológicos de Yolanda.

6. KMCC se encuentra, independientemente de que el DF sostenga que está en un hogar preadoptivo, **en una custodia provisional**. Aún no se ha completado el procedimiento de adopción final en relación con KMCC; esto es así conforme a la Sentencia del TA en el caso KLAN0501428 del 30 de marzo de 2006.

7. En el presente recurso, este Tribunal no tiene ante su consideración los aspectos relacionados con la solicitud de adopción de KMCC por Yolanda y Acevedo.

## II

Además de establecer las facultades del DF en casos que involucran el bienestar integral de los niños, la Ley Núm. 177, *supra*, claramente establece los parámetros de política pública de ese ejercicio ministerial en los casos en los cuales se remueve a un(a) menor por alegado maltrato. Hasta donde sea posible, siempre que no sea perjudicial al bienestar del menor, se aspira a **reunificar al menor con su familia**. En los casos procedentes se ubicará al menor con un recurso de su familia consanguínea.

La mencionada ley reafirma la responsabilidad e interés del Estado en garantizar y proteger el mejor interés del menor, pero siempre teniendo como norte —a los fines de erradicar la violencia—, facilitar la conservación de la familia y proveer *"oportunidades y esfuerzos razonables que permitan conservar los vínculos familiares"*. La reunificación familiar y el fortalecimiento de los lazos familiares fueron aspectos considerados por nuestro legislador como asunto catalítico para promover el bienestar de los menores.

Con esta finalidad, el Art. 43 de la Ley Núm. 177, *supra*, dispone que la custodia provisional del menor podrá ser otorgada en primer término *"[a] **un recurso de la familia del menor**."* 8 L.P.R.A. sec. 447(l)(b)(1).

El Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, Capítulo VI ▌ (Manual de Normas), dispone que para la consideración de los planes de permanencia **la primera**

**opción** es el **retorno** con los padres (biológicos o adoptivos) o **con los encargados**; y la segunda opción es la **colocación con otros familiares**. En cuanto a la adopción, los criterios establecidos en el Manual de Normas, *supra*, son similares y la opción de adopción por otras personas *"[e]s la alternativa deseable para un niño que no puede retornar con sus padres biológicos ni con otros familiares..."*. (Énfasis nuestro.)

Sólo cuando **un tribunal** determine que, luego de hacerse los esfuerzos razonables, el menor no puede retornar a su hogar, entonces puede considerarse la adopción por otras personas fuera del núcleo familiar tradicional. El Tribunal Supremo de Puerto Rico (TSPR) ha dispuesto que *"el plan de permanencia ideal es el retorno del menor con sus padres. De esto no ser posible, se favorece entonces la colocación con familiares. Cuando esas opciones no están disponibles, se favorece la adopción."* Rivera Báez, ex parte, res. el 26 de marzo de 2007, 170 D.P.R. ___, **2007 J.T.S. 63**.

El Reglamento para el Licenciamiento y Supervisión de Hogares de Crianza, Reglamento Núm. 6476 del 13 de junio de 2002, establece los requisitos mínimos que debe cumplir un hogar para ser considerado como un hogar de crianza. Para ello, el DF debe realizar un estudio social que demuestre la capacidad de satisfacer el bienestar integral del niño. En los casos en que exista la posibilidad de un recurso familiar, tal estudio debe realizarse con prontitud para que el menor pueda ser entregado a su entorno familiar, lo cual debe ser la prioridad siempre que no sea perjudicial al bienestar del menor.

En ausencia de ley aplicable a un caso, el tribunal resolverá conforme a la equidad civilista según definida en el Art. 7 del Código Civil de Puerto Rico (CCPR), 31 L.P.R.A. sec. 7. El Art. 7 del CCPR, *supra*, establece que *"...cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."*

El TSPR ha expresado que *"la misión del Juez es sobre todo y propiamente la de hacer justicia y esta justicia sólo puede realizarse **vivificando con la equidad la prescripción de la ley**..."*. (Énfasis nuestro.) Piovanetti Doumont v. Martínez, 99 D.P.R. 663, 667 (1971). Obviamente, *"[c]uando la ley manda a hacer una cosa o la prohíbe, la equidad no puede intervenir en sentido contrario o dispensar la obligación."* Finlay v. Fabián & Cía., 24 D.P.R. 152, 159 (1916).

## III
**Pendiente la culminación del caso de adopción de Yolanda y Acevedo, el DF no debía ubicar a KMCC en otro hogar preadoptivo. Esa petición es prioritaria y debe ser dilucidada en forma concluyente, final y firme a tenor con la Sentencia del TA del 30 de marzo de 2006.** Esto es particularmente importante cuando hay recursos familiares disponibles para KMCC y el DF no ha realizado estudios para la viabilidad de esos hogares en beneficio de ubicar la menor con familiares (según dispone la propia reglamentación del DF y su plan de permanencia concurrente), ello sin tener que desarraigar a KMCC de su entorno familiar.

Si bien es cierto que los procedimientos administrativos para los casos de maltrato, los planes de permanencia y los procedimientos de adopción se rigen mediante reglamentos del DF, las actuaciones del DF **no** pueden ser arbitrarias ni caprichosas.

En el presente caso **existen** recursos familiares como Yadira (tía-abuela materna de KMCC) que desde que supieron que KMCC fue removida del hogar de Yolanda, expresaron su disposición y disponibilidad al DF para ser consideradas como hogar-recurso y retener la custodia física de KMCC en su entorno familiar. El DF **tenía** que realizar un estudio social de tales recursos para entonces ser considerados como hogar para KMCC, conforme al plan de permanencia vigente y la propia reglamentación interna, ello a tenor con la Ley Núm. 177, *supra*. El DF **no hizo** ese estudio. Por el contrario, el DF estableció un *"nuevo"* plan de permanencia modificado para KMCC, el cual arbitrariamente descarta a los recursos familiares y no acoge los postulados de política pública que

se consignan en la ley y los reglamentos que regulan al DF. Estas regulaciones promulgan y promueven, en primera instancia, la reubicación familiar o la colocación con parientes, siempre que ello sea en beneficio del bienestar del menor.

El plan de permanencia para KMCC (que originalmente fue para adopción por Yolanda) fue alterado para mantener a KMCC en **otro hogar preadoptivo** que cuenta con una certificación del DF, independientemente de que **no sean familiares**.

Yadira también está disponible para adopción si finalmente el TPI-Aguadilla descarta a Yolanda y Acevedo como padres adoptivos de KMCC. A pesar de que el DF alega que ha descartado a Yolanda como recurso de adopción, luego de las intervenciones en apelación, el TPI-Aguadilla todavía no se ha pronunciado con una determinación final en cuanto a Yolanda y Acevedo. En ese caso, el DF está obligado por mandato de este Tribunal, a **evidenciar al tribunal de instancia que a Yolanda se le concedieron los remedios que el TA ordenó en su Sentencia del 30 de marzo de 2006, además de los estudios que se ordenaron,** ello **antes** de descartarla como recurso adoptivo.

Ciertamente, lo que exponen el PG y Yadira —por propio derecho—, es lógico, justo y correcto en derecho. Yadira informó que si el proceso de su hermana Yolanda termina favorablemente, entonces ella difiere su solicitud de custodia o adopción a favor de su hermana (Yolanda) y como ese otro caso no ha terminado, entonces lo que procede es recibir a KMCC en la custodia temporera **como un recurso familiar disponible**. Por consiguiente, la posición de Yadira no puede ser tergiversada.

Mientras se dilucida el caso de Yolanda, **no procede que el DF mantenga a KMCC en otro hogar preadoptivo con personas ajenas al núcleo familiar,** ello por el mero "*hecho*" de que existe un "*nuevo*" plan de permanencia de KMCC para adopción, el cual resulta ser uno modificado sin que se demostrara justificación para ello. Mientras esto se dilucida, el DF "*cumple*" con los requisitos del transcurso del tiempo previo a una adopción sin ponderar el daño emocional irreparable que puede estar causando a todas las personas involucradas en el proceso.

Esto es así porque si el TPI-Aguadilla concede la adopción a Yolanda, en primer lugar, KMCC sería entregada por disposición judicial. En segundo lugar, con el transcurso del tiempo, se habrá perpetuado un perjuicio psicológico-emocional a KMCC y sus hermanitos, quienes durante todo este tiempo permanecieron separados de su entorno familiar sin que exista un informe social que les haya descartado **ni siquiera un informe con evidencia de maltrato**. Además, puede haberse causado un perjuicio a terceros que tal vez han desarrollado lazos afectivos sobre KMCC sin necesariamente ser familiares consanguíneos. **No entendemos cómo la posición del DF <u>en este caso</u> ni beneficia a la menor ni a su familia consanguínea o afinidad, en especial a los propios hermanitos de KMCC.**

En este caso, la meta principal es el mejor interés y bienestar de los menores. No obstante, eso no puede ser justificación para perpetuar situaciones arbitrarias en la que el propio DF no ha cumplido de forma responsable con el trámite que debe seguirse en estos casos. Concurrimos con el PG que anticipa que de permitir esto último nos enfrentaríamos a un precedente nefasto para recursos familiares que desde el inicio de los procesos han estado dispuestos a recibir en su hogar a menores que, por diversas condiciones, no cuentan con un padre o madre responsable para satisfacer sus necesidades físicas, emocionales y psicológicas.

El TSPR señaló que "***no se puede tramitar una petición de adopción cuyo propósito es romper todo vínculo entre la menor y su familia biológica, sin que el foro primario haya hecho una determinación sobre si procedía otorgarle la custodia a los familiares que estaban dispuestos a asumirla; o si por el contrario procedía colocarla en un hogar preadoptivo.*" *Rivera Báez, ex parte, supra.* [Énfasis nuestro]. En el récord de este caso no encontramos **nada** que verifique que el TPI-Mayagüez o el DF hayan cumplido con esta encomienda ministerial.

Es claro que la discreción de un tribunal es amplia, pero ésta no es ilimitada y absoluta. Tampoco puede ser arbitraria. El TSPR ha sostenido que el abuso de discreción puede manifestarse en varias maneras, entre ellas cuando el juez emite una decisión sin tomar en cuenta o ignorando, sin razón para ello, un hecho material importante. *Pueblo v. Ortega*, 125 D.P.R. 203, 211 (1995).

No tiene mérito alguno el razonamiento del TPI-Mayagüez en la Resolución y Orden recurrida a los efectos de que, habiéndose recomendado la adopción como plan de permanencia bajo la Ley Núm. 177, *supra*, ya no era necesario ni apropiado colocar a KMCC bajo la custodia física de un recurso familiar. Tampoco entendemos que queda a la discreción judicial permitir la intervención de cualquier parte interesada; sin embargo, en el caso ante nuestra consideración nos parece que las partes interesadas son algo más, son partes indispensables con interés en el bienestar de KMCC y quienes deben ser oídas.

No nos merece **ningún mérito** la argumentación del DF acerca de que la Minuta de la vista del 20 de febrero de 2007 demuestra lo que expone en su Alegato. A esa vista, Yadira no compareció a defenderse de los argumentos que unilateralmente presentó el DF y que afectaron su posición ante el TPI-Mayagüez. Un breve examen de las mociones presentadas (por propio derecho) por Yadira, en especial las que presentó ante este Tribunal, nos mueve a verificar la elocuente refutación a los planteamientos del DF. Aunque no es necesario ampliar el argumento, también lo corroboran los escritos presentados por derecho propio por Rebecca y Orquídea ante este Foro. Con tantos recursos familiares disponibles y potencialmente en posición de ser considerados, así como capacitados por el DF para tener la custodia de KMCC sin afectar su entorno familiar, conviene preguntarse ¿cómo justificar el proceder del DF en este caso?

## IV

Por los fundamentos antes expresados, procedemos a expedir el auto solicitado y **revocamos** la Resolución y Orden recurrida.

Se ordena al TPI-Mayagüez que celebre una nueva vista de seguimiento en el caso de maltrato ante su consideración con audiencia a los familiares de la menor KMCC, en específico Yadira, y así dilucidar los asuntos que unilateralmente permitió articular al DF sin la presencia de Yadira y sus familiares, ello en cuanto al alegado incumplimiento con los procesos administrativos. Tanto Yadira como sus familiares podrán comparecer a la vista de seguimiento, con representación legal si así lo determinan.

Conforme a lo aquí expuesto, el TPI-Mayagüez deberá escuchar los planteamientos de los familiares en cuanto al "*nuevo*" plan de permanencia de KMCC que utilizó el DF para descartarlos. En este caso **no hay evidencia** de que el DF haya activado en forma alguna el plan concurrente a su plan de permanencia original.

El DF deberá acudir a la vista de seguimiento con los informes sociales de todos los recursos familiares que se han ofrecido para retener la custodia de KMCC, pendiente la determinación final del caso de adopción en Aguadilla, que supuestamente consideró antes de descartarlos como recursos familiares, a tenor con lo que disponen sus propios reglamentos y manuales de procedimientos para implantar los planes de permanencia que han mantenido a KMCC separada de sus familiares. Además, el DF deberá evidenciar que tales planes de permanencia fueron considerados para descartar los informes sociales originales que claramente recomendaban la colocación con familiares.

Aunque no tenemos el caso de adopción ante nuestra consideración, más allá de lo que este Tribunal dispuso en la Sentencia del 30 de marzo de 2006, el foro de instancia deberá atender el hecho de que el procedimiento dispuesto en la Ley Núm. 177, *supra*, sobre maltrato de menores debe finalizarse **antes** de presentar una petición al amparo de nuestra Ley de Adopción. En cuanto a ese particular, nos preocupa el considerar que lo acontecido en cuanto a KMCC en mayo de 2005 en realidad fue una remoción administrativa de su hogar de crianza en el que residía con sus "*encargados*" desde su nacimiento una vez fue entregada (por

el propio DF) con su otra hermanita, quien no fue removida del hogar de Yolanda y Acevedo, así como tampoco otros dos menores.

En relación con esa "*segunda*" remoción, el expediente del caso no demuestra que el DF haya realizado las correspondientes gestiones ministeriales ante un tribunal de instancia. Independientemente de que el DF tiene la "*custodia legal*" de KMCC, el DF había entregado la custodia física a Yolanda y Acevedo, quienes fungían como **encargados** de KMCC desde su nacimiento. Ni siquiera se evidencia que el DF haya cumplido con sus propios manuales de procedimiento, los cuales delimitan la responsabilidad primaria en cuanto al retorno de la menor a su entorno familiar o con personas encargadas.

El TPI-Mayagüez deberá ordenar al DF que comparezca **a esa vista** con su Secretario, representante autorizado o el propio T.S. Reteguis, acompañado de todos los documentos necesarios para iniciar los procesos de consideración (cualificación y certificación) administrativa para casos de adopción, específicamente para el caso de KMCC. Independientemente del resultado del "*nuevo*" plan de permanencia, el DF completará o actualizará los informes-estudios sociales relacionados con los recursos **familiares** disponibles para KMCC, tanto para adopción como para custodia temporera.

En la mencionada vista, Yadira ratificará si desea o no ser considerada como recurso adoptivo de KMCC, independientemente del resultado del caso en el TPI-Aguadilla, de manera que pueda completar todos los documentos requeridos y provistos por el DF, los cuales **tendrán** que estar disponibles el día de la vista y así iniciarse el proceso de su evaluación administrativa. De esta manera, el DF estará en condiciones de adelantar y culminar esa solicitud en forma paralela con los procedimientos del caso, evitando así toda esta situación de conflicto entre todos los que en realidad desean el bienestar de KMCC y sus hermanitos. Obviamente, si a Yolanda le fuera adjudicada la adopción en los procedimientos del TPI-Aguadilla, todas las controversias tomarían otro giro que podría significar el fin de esta odisea familiar. Con esto no estamos sancionando que ésta es la responsabilidad ministerial futura del DF ni que estemos estableciendo la norma general en todo caso. Además, el DF comparecerá con un informe relacionado con el estado procesal del caso de adopción de KMCC que continúa en Aguadilla, de forma que el TPI-Mayagüez quede informado sobre los procesos.

Sujeto a revisión judicial, el TPI-Mayagüez deberá ponderar si a la luz de la consideración de los informes completados o actualizados que el DF **tendrá** el día de la vista, corresponde ordenarle de inmediato que se abstenga de adelantar o culminar los procesos de adopción de KMCC con personas que no son sus familiares o incluso ordenar la devolución de KMCC, en forma supervisada, a su entorno familiar.

El TPI-Mayagüez deberá evaluar si conviene a los mejores intereses de KMCC ordenar su comparecencia el día de la vista o a una vista de seguimiento.

**Este caso debe resolverse con prioridad en calendario, de forma que en caso de que la menor sea devuelta a su entorno familiar o entregada para adopción por sus familiares, puedan reestablecerse vínculos emocionales saludables, evitando así el daño irreparable que se pueda estar causando a KMCC y a todas las personas involucradas en este caso.**

El DF apoyó su decisión de ubicar a KMCC en un hogar de crianza preadoptivo (sin que la petición de adopción de Yolanda hubiera culminado ante el TPI-Aguadilla) con personas no familiares, basado en conjeturas de que Rebecca y Yadira deseaban la custodia de KMCC para entregarla nuevamente a Yolanda. No obstante, el DF siempre pudo tomar las medidas cautelares para evitar esa situación (si estimaban que era lo mejor para el bienestar de KMCC) sin tener que desarraigarla en forma traumática de su entorno familiar consanguíneo, afectando así la relación de KMCC con sus propios hermanos, una de las cuales ha permanecido en el mismo entorno familiar "*desaprobado*" por el DF.

Notifíquese inmediatamente al Secretario del Departamento de la Familia, al TPI-Mayagüez, a los abogados y a las partes que han comparecido por derecho propio, por facsímil y la vía ordinaria.

Al recibo del facsímil, se Ordena al TPI-Mayagüez comunique por vía telefónica a las partes que han comparecido por derecho propio la disponibilidad de una copia de esta Sentencia en su Secretaría sin costo alguno.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones